IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

PACIFIC CYCLE, INC.,

                        Plaintiff,                              OPINION AND
                                                                  ORDER
        v.

POWERGROUP INTERNATIONAL, LLC,                          12-cv-529-slc
  (a/k/a POWERGROUP INTERNATIONAL, INC.),
TOMBERLIN AUTOMOTIVE GROUP, INC. and
MICHAEL TOMBERLIN,

                        Defendants.

---

        This lawsuit presents a contract dispute arising out of an April 2009 license agreement

between plaintiff Pacific Cycle and defendant PowerGroup International, LLC.  The agreement

licensed PowerGroup to sell Schwinn-branded motor scooters.  Pacific Cycle terminated the

agreement in April 2012 due to PowerGroup's failure to satisfy its payment and reporting

obligations, then commenced this action for contract damages and injunctive relief in the Circuit

Court for Dane County on June 28, 2012.  PowerGroup removed the lawsuit to this court on

July 27, 2012 and filed counterclaims for breach of contract, fraudulent inducement and

rescission, asserting that during contract negotiations, Pacific Cycle had misrepresented facts

upon which PowerGroup had relied to its detriment when deciding to enter into the agreement.

This court has jurisdiction under the diversity statute, 28 U.S.C. § § 1332 and 1441(a).

        Before the court is Pacific Cycle's motion for partial summary judgment on its claim that

PowerGroup breached the license agreement, and on PowerGroup's counterclaims.  Essentially,

Pacific Cycle is seeking a determination from this court that PowerGroup is liable for breach of

contract in a specified amount of $1.56 million (plus costs and fees), while leaving for trial

questions as to whether the codefendants share this liability.

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  F.R.Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party has the initial burden of demonstrating that it is entitled to summary judgment.  *Id*. at 323.  Once this burden is met, the nonmoving party must designate specific facts to support or defend each element of the cause of action, showing that there is a genuine issue for trial.  *Id*. at 322-24; Fed. R. Civ. P. 56(e).

Whether seeking or opposing summary judgment, the parties must present admissible evidence to show either that the movant is entitled to judgment as a matter of law, or conversely, that disputed issues of fact remain such that a jury may return a verdict for the non-moving party.  *Berry v. Chicago Transit Authority*, 618 F.3d 688, 291 (7th Cir. 2010).  Although a non-moving party's affidavit can constitute affirmative evidence to defeat a summary judgment motion, conclusory allegations, unsupported by specific facts, will not suffice to meet this burden.  *Payne v. Pauley*, 337 F3.3d 767, 773-74 (7th Cir. 2003) (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990)).

As discussed below, Pacific Cycle has presented admissible evidence establishing all elements of its breach of contract claim and showing that PowerGroup cannot meet its burden on its counterclaims.  PowerGroup, however, has failed to meet its evidentiary burden, either in opposition to Pacific Cycle's contract claim or in support of its own counterclaims.  Although PowerGroup purports to dispute many of Pacific Cycle's proposed facts, many of these disputes are not "genuine" because they rest upon inadmissible evidence or conclusory allegations not founded on personal knowledge or supported by specific facts.  *Gunville v. Walker*, 583 F.3d 979,

985 (7th Cir. 2009) ("Admissibility is the threshold question because a court may consider only admissible evidence in assessing a motion for summary judgment").  When the court considers only those of PowerGroup's proposed facts that are properly supported by admissible evidence, then construes in PowerGroup's favor that which remains, this evidence fails to establish that any genuine disputes of material fact remain for a jury to resolve.  Accordingly, I am granting Pacific Cycle's motion for summary judgment.

Solely for the purpose of deciding Pacific Cycle's motion for summary judgment. I find these facts to be material and undisputed:

FACTS

## I.  The Parties

Plaintiff and counterclaim defendant Pacific Cycle, Inc. is a Delaware Corporation with its principal office located in Madison, Wisconsin.  Pacific Cycle is in the business of designing, marketing and distributing bicycles and recreational products in the United States and around the world using its portfolio of well-known brands, including the Schwinn brand.

Defendant and counterclaim plaintiff PowerGroup International, LLC is a limited liability company organized under the laws of the State of Georgia with its principal office located in Augusta, Georgia.  Defendant Michael Tomberlin is the sole member, President and CEO of PowerGroup.[1]  He is a citizen of Georgia.  *See* Defs' Answer, dkt. 5, ¶ 12.

Defendant Tomberlin Automotive Group, Inc. is a corporation organized under the laws of the State of Georgia with its principal office located in Augusta.  Tomberlin Automotive

---

[1]  Defendant PowerGroup International, Inc., does not exist and was named by plaintiff in error.

Group designs and engineers a wide range of on-road national highway Transportation and Safety Administration compliant electric vehicles sold throughout the world with international distributors in over 40 countries.  Michael Tomberlin is the majority shareholder of Tomberlin Automotive Group.

## II.  The License Agreement

### A.  Pacific Cycle Decides to Exit the Motor Sports Business

In 2004, Pacific Cycle created its Schwinn Motor Sports Division dedicated to the sale of Schwinn-branded motor scooters.  The Motor Sports division was founded by George Simone, who held the position of Vice President Motor Sports and had overall responsibility for the division.  By 2007, Schwinn had captured 9% of the United States scooter market; by 2008, the division was selling more than 5,000 scooters each year and generating annual revenue above $6 million.  Even so, Motor Sports was a small-volume business outside of Pacific Cycle's core business of bicycles and bike accessories.

Sometime in 2008, Pacific Cycle's president, Alice Tillett, asked Simone to prepare a business plan evaluating the costs and benefits of continuing the division.  Simone submitted his plan on September 5, 2008.  Simone reported the Motor Sports Division's difficulties with its Chinese supplier, FYM, noting that "over the past 9 months FYM has faced a number of challenges in its business and they have directly affected Schwinn Motor Sports."  Dec. of George Simone, dkt. 21, exh. A.  Simone reported that FYM had been having cash flow problems that had led to increased lead times and a drop in quality.  *Id*.  Simone indicated that "the common belief is that FYM is using new suppliers which may have lower quality standards

4

than previous ones," and one goal of the Motor Sports Division was to broaden its supplier base. *Id*.

Simone presented three options to Pacific Cycle: 1) keep and continue the Motor Sports Division, then invest in infrastructure and more personnel to focus on product issues; 2) license the Schwinn brand to someone else; or 3) form a joint venture with a Chinese manufacturer. Simone warned that no matter which course Pacific Cycle chose, it could not continue with its current business model and it would have to focus on improving quality, observing that "[i]f we cannot provide the necessary replacement part then that's when we start losing dealers in droves." *Id*.

Tillett decided that the best option was for Pacific Cycle to get out of the motor scooter business and to begin licensing the Schwinn brand to a company that had more experience in the motor sports arena, so that Pacific Cycle could focus on its core businesses.

### B. Pacific Cycle Meets PowerGroup

Enter Michael Tomberlin. In 2008 Simone had met Tomberlin by chance when they both were in China visiting FYM's facility. Tomberlin was there because FYM manufactured electric vehicles for Tomberlin Automotive Group. Another Tomberlin company, PowerGroup, sold and distributed its own line of products, including combustion-powered motorsports products such as Tomberlin Outdoor™ branded off-road ATVs and motor scooters. PowerGroup used a dealer direct business-to-business network of community-based motor sports retailers to sell its products. Simone and Tomberlin began discussing the possibility of Pacific Cycle entering a licensing agreement with PowerGroup.

In January 2009, Tomberlin met with Tillett, Simone and Robert Silvis, Pacific Cycle's general counsel. (It is unclear from the record if this meeting took place at Pacific Cycle's offices in Madison or PowerGroup's offices in Augusta, but everyone agrees that the meeting occurred.) Either during this meeting or at the end of 2008,[2] Simone gave a PowerPoint presentation that included information about Pacific Cycle's dealer network and the Motor Sports Division's 2009 pre-season orders, inventory and other information. Among the points Simone made were:

- "Schwinn has placement in 471 dealerships, from Top 100 dealers to boutique shops."

- 2,486 pre-season orders had been placed for 2009, which translated to $3,838,440.

- Schwinn's motor sports division was a "turn key operation."

In this presentation and in subsequent discussions, Pacific Cycle's representatives characterized the Motor Sports Division as a growing, profitable business but explained that it did not fit Pacific Cycle's culture from a regulatory standpoint. Pacific Cycle's executives told Tomberlin that one of their primary issues related to the supply of scooters and parts from FYM, the company where Pacific Cycle sourced its scooters.

Tomberlin made his own presentation during the January 2009 meeting. Tomberlin stated that PowerGroup had substantial experience in the power sports industry, had its own established dealers and was well-versed in the regulations governing motor vehicles. Tomberlin also represented that he had a strong relationship with the owner of FYM and knew the family well. Tillett saw this personal relationship as a strong advantage for Tomberlin: Pacific Cycle

---

[2] The parties don't dispute that this presentation was made, but there is uncertainty as to when.

was a relatively small customer of FYM's and had trouble obtaining from FYM parts for its products.  Tomberlin, by contrast, seemed to have a significant relationship with FYM.

Discussions continued for the next few months.  Simone provided Tomberlin with documentation including spreadsheets, worksheets, financial data and PowerPoint slides, about Motor Sports.  Tomberlin asked for full disclosure of any issues that Pacific Cycle was currently experiencing with its motor scooter line.  In response to these questions, Simone represented that dealers and customers were "hungry for orders."

Near the end of March 2009, Tillett and Tomberlin exchanged and revised drafts of a "deal memo" outlining the basic terms of a license agreement between Pacific Cycle and PowerGroup.  Meanwhile, Tomberlin requested validation of the pre-orders.  On April 2, 2009, Simone emailed Tomberlin another PowerPoint presentation and a spreadsheet, both of which showed that Pacific Cycle had 2,486 pre-orders for scooters.  The PowerPoint depicted two bar graphs per month, one representing "forecast" totals for the month and the other showing "pre-season order" totals for the month. The spreadsheet included more detailed information about the pre-orders, breaking them down by dealer, dealer number, and the various types and numbers of scooters ordered.

The "pre-season order" information that Pacific Cycle maintained represented information that the division's district sales managers collected from dealers about the models and quantities of scooters they planned to order in the coming year.  The orders were sometimes taken on a paper form initially but ultimately were entered into Pacific Cycle's computerized SAP system.  Simone obtained the data concerning pre-orders that he provided to Tomberlin from the SAP system, not from any paper forms.  Pre-season orders were actual, existing orders,

7

but dealers were not contractually bound to accept or pay for the quantities they pre-ordered.[3]
Simone testified that he used the pre-season orders as one tool to predict future sales.

That same day, April 2, 2009, Simone sent an email to Tomberlin that stated:

> FYM has only shipped 50 scooters this week and for the most part has not been communicating with us to what is going on.  So with that said I have changed the forecast to represent sales of what we have in stock and the 50 pieces on the water.  Not to be redundant but until we correct the supply issue I can't honestly project sales.

Simone attached a sales forecast that showed sales of only 189 scooters, which represented 139 in "current inventory" plus 50 "incoming units."  Obviously, 189 was a small fraction of Pacific Cycle's pre-orders.

Based on these numbers, Simone made a "Conservative Bottom Range Sales & Revenue Forecast," that predicted gross revenue of $240,060 and gross profits of $114,978.  Simone believed this forecast to be accurate and reasonably reliable at the time it was made.  Tomberlin acknowledged receipt of the email by forwarding it to an employee and instructing him to incorporate the inventory of Tomberlin scooters into the forecast.

---

[3]Although PowerGroup states that it disputes this proposed finding of fact, it has not provided any evidence to refute Simone's testimony that dealers were not contractually bound to accept or pay for the quantities they pre-ordered.  *See* PowerGroup's Response to Pacific Cycle's PPFF, dkt. 30, # 40.  Although PowerGroup asserts that "[d]ue to lack of documentation, it is unknown as to whether dealerships could refuse delivery of their pre-season orders with no penalty," *id.*, # 62, it did not bring any motion to compel discovery prior to filing its response to the summary judgment motion, nor did it argue that it was unable to respond to the motion because of any failure by Pacific Cycle to provide necessary discovery.  *See* F.R.Civ. P. 56(d) (court may allow time to take discovery if nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition); Pretrial Conf. Order, dkt. 10, at 3 ("Parties are to undertake discovery in a manner that allows them to make or respond to dispositive motions within the scheduled deadlines.").  Having failed to avail itself of the remedies it had available, PowerGroup's complaint that it "lacks documentation" is insufficient to place into dispute Pacific Cycle's contention that a pre-order was not a binding contract.  Further--and perhaps more critically--as explained below, the undisputed evidence shows that Tomberlin knew this at the time.

The parties reduced their "deal memo" to final form on or about April 7, 2009. Danna Dueck, Pacific Cycle's licensing manager, prepared a draft of the formal license agreement and emailed it to Tomberlin on April 8, 2009. On April 9, Tomberlin emailed it back to Dueck with revisions, expressing concern that the deal be finalized quickly:

> We have a real sense of urgency to close this out early as possible.
> I am concerned all the pre-orders from your dealers will fade away
> if they believe we cannot supply them with product.

### C.  The License Agreement

After some additional discussion and revisions, Pacific Cycle and PowerGroup executed the license agreement on or about April 16, 2009. Tomberlin has testified that Pacific Cycle gave him all the documentation he had asked for to help him evaluate whether to enter the license agreement.

The parties' license agreement grants PowerGroup the right to sell Schwinn-branded scooters in exchange for a 10% royalty. There were no minimum sales or royalty obligations for 2009 or 2010. Beginning in 2011 (Contract Year 3), PowerGroup had minimum sales requirements and was obliged to pay Pacific Cycle a minimum royalty of $300,000. The minimums increase modestly each year thereafter through the agreement's initial term, which ends in 2014. The license agreement also provides that PowerGroup would purchase Pacific Cycle's existing inventory of parts and scooters, and that PowerGroup would provide warranty service to the Schwinn scooters that Pacific Cycle had sold. Pacific Cycle agreed that it would provide PowerGroup with "copies of all dealer agreements, files, warranty history, proof of insurance, product programs, EPA certificates, pre-orders, state license and all other documentation necessary to transition the business."

9

The license agreement contains a broad non-assignment clause that prevents PowerGroup from assigning or delegating any of its rights or responsibilities under the agreement.  Paragraph 9.1(a) provides:

> LICENSEE acknowledges that this agreement and the rights granted herein are personal to the LICENSEE and, without the prior written consent of LICENSOR, may not be assigned, sublicensed, pledged, encumbered or otherwise affected, nor may any of LICENSEE's duties be delegated. Any attempted assignment, sublicense, transfer or encumbrance shall be void and shall constitute an incurable breach of this Agreement, entitling, but not obligating LICENSOR to terminate this Agreement in accordance with the provisions of Paragraph 10.2.

Exhibit B-2 to the license agreement, Royalty Rate and minimum Net Sales, provides:

> Sales of 2009 products are contingent upon successful transfer of all certificates, assignable dealer agreements, validity and collection of existing preorders and the phase in of the 2010 EPA emissions certificates.

Similarly, in Exhibit B-7 to the license agreement, titled "Other Terms and Conditions," the parties expressly recognize a range of potential difficulties that PowerGroup would face in selling Schwinn scooters.  Among other things, Exhibit B-7 provides:

> Both parties recognize that the manufacturer of Licensor's scooters is in an unknown condition however both note the level of uncertainty with regard to future support and neither Licensor nor Licensee shall bear the other's exposure to support field inventory and consumer product expectations.

> Licensee acknowledges and understands that there is currently no existing effort in obtaining 2010 certifications on behalf of Licensor with regard to emissions and the potential of a delayed launch of the 2010 model year.

> Licensor agrees to assist Licensee to facilitate scooter support previously sold by Licensor.  Parts support may be a significant issue and Licensee will assist in this area with on site personnel. New manufacturing relationships may need to be put in place and it is reasonable to anticipate an interruption in product flow.

10

The license agreement provides a remedy in the event the agreement is terminated for an incurable breach.  It specifies that in the event of termination, any unpaid balances of the guaranteed minimum royalty "for each and every Contract Year within the Initial Term" accelerate and become immediately due and payable to Pacific Cycle, "as liquidated damages and not as a penalty."  Par. 10.2(b).  PowerGroup also is liable for interest at 12% per annum for all amounts due from the date due until the date of payment,  Par. 4.5(b), and for Pacific Cycle's attorney's fees incurred in this enforcement action.  Par. 11.5.  The license agreement was to be governed by and interpreted under Wisconsin state law.  Par. 11.3.

### D.  PowerGroup has Difficulties Meeting its Obligations under the Agreement

During the negotiation of the license agreement, Tomberlin and Tillett discussed the possibility that PowerGroup would hire George Simone and members of the scooter sales team. After the deal was finalized, Simone and some members of the sales team did in fact leave Pacific Cycle and join PowerGroup, where Simone continued to be responsible for running the Schwinn motor scooter program.  (Simone left PowerGroup in April 2010.)  At the time Simone left Pacific Cycle, he was encouraged to take whatever files or information he deemed necessary to run the motor scooter program at PowerGroup, which he did.  According to Simone, during the transition period, there was nothing that he requested from Pacific Cycle that he did not promptly receive.  In Simone's opinion, Pacific Cycle provided all the information that he needed to operate the Schwinn motor sports program at PowerGroup.

11

By Fall 2008, the United States economy had fallen into a major recession.  In 2009, scooter sales fell precipitously, sales did not meet forecasts, and dealers did not honor their pre-season orders.  According to statistics from the Motorcycle Industry Council published in the magazine Powersports Business, scooter sales in the United States fell by 59 percent from 2008 (76,748 units sold) to 2009 (31,451 units sold).  By Simone's estimate, as many as 25 percent of power sports dealers went out of business in 2009.  By the end of 2009, PowerGroup had sold only $280,538.80 worth of Schwinn product to 62 dealerships, only slightly more than Simone had forecast in early April.

On February 25, 2010, Tomberlin sent an email to Tillett indicating that PowerGroup was unlikely to be able to meet its minimum sales and royalty obligations due, in part, to the fact that "less than five percent of the existing orders [were] being executed upon."  He reiterated these concerns in a July 8, 2010 email in which he expressly asked that the Contract Year 3 minimums be eliminated.  After a further exchange of information, on August 10, 2010, Tillett emailed a draft proposal to Tomberlin that proposed amending the annual minimum sales guarantees and royalty guaranty to numbers much lower than called for in the original license agreement.  In exchange, Tillett proposed, PowerGroup's sales territory would be limited to the United States and Canada and the renewal term would be removed.  Tillett's proposal concluded with the statement, "This document is not a contract."

Despite numerous requests by Pacific Cycle, neither Tomberlin nor anyone from PowerGroup ever offered any concrete feedback to this proposal. The parties never executed any amendments to the License Agreement.[4]

On September 18, 2010, Tomberlin emailed Dueck asking how Pacific Cycle wanted to go about terminating dealers "that are not ordering but are still tying up a market." Dueck responded that Pacific Cycle was not terminating any dealerships at that time so long as the dealers were willing to continue to try to sell the units they had in stock.

In an email to Dueck on October 12, 2010, Tomberlin stated that he "will request that we supply you a list of the dealers that did not honor the orders you guys had in house and provided to us as well as those that still have not ordered."

---

[4] PowerGroup admits that no formal amendment was executed but it insists that the parties were "operating under" the reduced minimums proposed by Tillett in her August 2010 email. PowerGroup's sole support for this assertion is a conclusory declaration to that effect by Tomberlin. Dkt. 28, ¶11.

This evidence does not give rise to a genuine dispute of fact on this issue. Tomberlin's declaration—which is unsupported by specific facts—is flatly contradicted by the numerous emails sent by Pacific Cycle asking for a response to Tillett's proposal, which it never received. *See* Plt.'s PPFF Nos. 83-94 (all undisputed). In particular, on December 19, 2011, Pacific Cycle's Danna Dueck wrote to PowerGroup's Adam Harris, asking for "an update on your discussions with [Tomberlin] regarding your review of the deal memo provided and how you see us moving forward," and noting that, "[a]t this time, your active license agreement has some large financial commitments for 2011 which will become due with your Q4 2011 royalty report and payment (1/31/12)."

In the face of this specific evidence, which reflects Pacific Cycle's understanding that the terms of the original agreement still were in effect, Tomberlin's bald assertion that the parties were operating under the minimums proposed by Tillett is insufficient to create a dispute of fact. *See, e.g., Turner v. The Saloon, Ltd.*, 595 F.3d 679, 690-91 (7th Cir. 2010) (party opposing summary judgment cannot rely on unsupported ipse dixit that is flatly refuted by the hard evidence offered by its opponent); *Drake v. 3M*, 134 F.3d 878, 887 (7th Cir. 1998) ("Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter, rather it requires affidavits that cite specific concrete facts establishing the truth of the matter asserted.").

13

### E.  Breach and Notice by Pacific Cycle

Unknown to Pacific Cycle, effective January 1, 2011, PowerGroup merged with another company owned by Tomberlin, Asian Ventures LLC.  Also, effective January 2, 2011, PowerGroup entered a "Management Agreement" with Tomberlin Automotive Group, pursuant to which Tomberlin Automotive Group undertook PowerGroup's responsibilities and exercised PowerGroup's rights under the license agreement.  These actions, which PowerGroup did not disclose to Pacific Cycle, constituted "incurable breaches" of the non-assignment provision in paragraph 9.1(b) of the license agreement, which prohibited any "delegation" of PowerGroup's duties and any "transfer" of PowerGroup's "rights, obligations, or both."

At the end of 2011 and the beginning of 2012, Dueck pressed PowerGroup for overdue payments and royalty reports.  Tomberlin responded by email on January 24, 2012 that he regarded PowerGroup's Schwinn decision to be an "error" and asked Dueck to "suggest the best path to execute this separation."  On February 21, 2012, Pacific Cycle sent PowerGroup a notice of breach; on April 9, 2012, counsel for Pacific Cycle sent PowerGroup a termination notice.  Pacific Cycle received no response.

Pacific Cycle sued PowerGroup, Tomberlin Automotive Group and Tomberlin for breach of contract in the Circuit Court for Dane County.  PowerGroup timely removed the case to this court, alleging diversity jurisdiction.  The present motion for summary judgment is directed solely against PowerGroup.

OPINION

## I.  Pacific Cycle's Claim for Breach of Contract

To succeed on its breach of contract claim, Pacific Cycle must show:  1) a valid contract; 2) breach of that contract; and 3) damages.  *Matthews v. Wisconsin Energy Corp., Inc.*, 642 F.3d 565, 571 (7th Cir. 2011) (glossing Wisconsin law); *Cousin Subs Systems Inc. v. Better Subs Development Inc.*, 2011 WL 4585541, *9 (E.D. Wis. Sept. 30, 2011).  PowerGroup does not dispute Pacific Cycle's proposed facts showing that PowerGroup breached the License Agreement by failing to submit sales reports and failing to pay royalties for the third or fourth quarters of 2011, by merging with Asian Ventures and by entering a management agreement with Tomberlin Automotive Group.

Instead, PowerGroup defends against the motion for summary judgment by arguing that the License Agreement is voidable, either because it was fraudulently induced or because Pacific Cycle was the first to breach.  *See Tietsworth v. Harley-Davidson, Inc.*, 2004 WI 32, ¶ 36, 270 Wis. 2d 146, 677 N.W. 2d 233 (contract fraudulently induced is void or voidable).  It asks the court to rescind the contract.[5]

---

[5] In its reply brief, Pacific Cycle argues that PowerGroup waived its right to rescind because it waited too long to assert its right and affirmed the contract by continuing to seek and accept warranty payments from Pacific Cycle even after it learned of the alleged misrepresentations.  In addition, it contends that rescission is not an available remedy here because it is impossible to return Pacific Cycle to the position it was in prior to executing the license agreement with PowerGroup.  *See* dkt. 33, at 12-13. Although these are strong arguments, PowerGroup waived them by failing to raise them until its reply brief. *See Wilson v. Giesen*, 956 F.2d 738, 741 (7th Cir. 1992) ("This argument is waived, however, as the plaintiff failed to raise it until his reply brief, leaving the defendants no chance to respond.").

## II.  PowerGroup's Claim of Fraudulent Inducement

To establish that it was fraudulently induced to enter into the License Agreement, PowerGroup must prove that 1) Pacific Cycle made a representation of fact; 2) the representation of fact was false; 3) PowerGroup believed and relied on the misrepresentation to its detriment or damage; 4) the misrepresentation was made by Pacific Cycle with knowledge that it was false or recklessly without caring whether it was true or false; and 5) the misrepresentation was intended to deceive PowerGroup and to induce PowerGroup to act on it to its detriment or damage.  *Tietsworth*, 2004 WI 32, ¶ 13,  270 Wis. 2d 146, 157, 677 N.W. 2d 233.

Powergroup also must show that the misrepresentation occurred before contract formation, *Kaloti Enterprises, Inc. v. Kellogg Sales Co.*, 2005 WI 111, ¶30, 283 Wis. 2d 555, 699 N.W. 2d 205, and that PowerGroup's reliance on the misrepresentation was reasonable.  *Kailin v. Armstrong*, 2002 WI App 70 ¶ 31, 252 Wis. 2d 676, 702, 643 N.W. 2d 132, 146.[6]  Silence or the failure to disclose a fact is treated as equivalent to representing the nonexistence of that fact, if the silent party was under a duty to disclose it.  *Ollerman v. O'Rourke Co.*, 94 Wis. 2d 17,

---

[6] These are the same elements that PowerGroup must prove to establish its counterclaim for fraudulent inducement.  Accordingly, both its tort claim and its affirmative defense to Pacific Cycle's breach of contract claim based on fraudulent inducement fail for the same reasons.  PowerGroup cites no authority for its suggestion to the contrary.  *See* Br. in Opp., dkt. 26 at n.2.

Pacific Cycle argues that, insofar as PowerGroup appears to be seeking tort damages for the misrepresentation, its claim is barred by Wisconsin's economic loss doctrine.  Because I have concluded that PowerGroup has not adduced evidence from which a reasonable jury could find the essential elements of intentional misrepresentation in the first place, it is unnecessary to consider the economic loss doctrine.  Insofar as PowerGroup is seeking only the contract remedy of rescission, then Pacific Cycle appears to agree that the economic loss doctrine does not apply.  *See Harley-Davidson Motor Co., Inc. v. PowerSports, Inc.*, 319 F.3d 973, 985 (7th Cir. 2003) (Wisconsin's economic loss doctrine does not bar misrepresentation claims for contract rescission).

24, 288 N.W.2d 95, 99 (1980).  A party to a business transaction is under a duty to disclose facts basic to the transaction where the other party would reasonably expect disclosure of those facts.  *Id*.

PowerGroup contends that Pacific Cycle, through Simone, made various misrepresentations of fact relating to three primary issues:  1) pre-season orders; 2) dealers; and 3) the "turn key" nature of Pacific Cycle's Motor Sports Division.  In addition, PowerGroup contends that Pacific Cycle failed to disclose two facts:  1) the fact that dealers were "stuffed" with inventory; and 2) that Pacific Cycle would continue to exert control over dealers after the agreement's execution.  I consider each of these contentions in turn:

### A.  Pre-season orders

PowerGroup contends that Pacific Cycle, through Simone, misrepresented that the 2,486 pre-season orders shown on the spreadsheets were "real, actual orders already placed by the dealers" that Tomberlin could count on as "assets in existence," when in fact they were merely "expected" orders that might or might not mature into actual sales.  This contention has two threads:  first, that Simone lied about the quantity of the orders; second, that he lied about the certainty of the orders.  According to Tomberlin, he based his decision to execute the license agreement on his understanding that existing, guaranteed orders would "make [the deal] cash flowable."

PowerGroup's claim with respect to the existence of 2,486 pre-season orders fails because it has adduced no evidence showing that the statement was false when made.  Simone testified that he pulled the number 2,486 from Pacific Cycle's SAP system, and that the data in this

system had been inputted by the district sales managers who had contact with the dealers.   He provided a spreadsheet to Tomberlin which itemized each order and provided supplemental detail, including the name and number of the dealer who placed the order and the various types and numbers of scooters ordered.   Tomberlin has acknowledged receiving this spreadsheet.

Notwithstanding the detailed information Simone provided about the pre-orders, PowerGroup suggests that the numbers were made up because the orders did not come to fruition and because Pacific Cycle did not provide the underlying paper documentation for each of the 2,486 orders entered into the SAP database, in spite of repeated requests by Tomberlin for that documentation.   Even granting all reasonable inferences in PowerGroup's favor, this evidence does little more than show "some metaphysical doubt as to the material facts," which is not enough to defeat a motion for summary judgment.   *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).   The fact that these pre-season orders did not mature into actual sales is different from saying the dealers never actually placed these pre-orders in first place.   Simone has provided an explanation for the dealers' failure to honor their pre-season orders—the economic downturn—that PowerGroup has not placed genuinely into dispute.   As for the asserted lack of documentation, Tomberlin acknowledged that he had obtained from Pacific Cycle all the information he needed to decide whether to enter into the license agreement.   The mere fact that Pacific Cycle may not have produced a piece of paper for all 2,486 orders is not enough to establish the falsity of Simone's spreadsheet.   Finally, even if the number 2,486 somehow were to have been false or inaccurate, PowerGroup has no evidence to show that Simone–or anyone else at Pacific Cycle–knew this.   In sum, PowerGroup has

presented no evidence that 2,486 pre-season orders did not in fact exist in April 2009, or that if they didn't, Simone had any reason to know his data was inaccurate.

But this segues to the second aspect of PowerGroup's claim with respect to the pre-orders, which is that Simone falsely represented that these pre-season orders were "in the tube," "bankable," or somehow otherwise guaranteed such that they would cash flow the agreement. Pacific Cycle first denies that Simone ever made such a representation–for summary judgment purposes, the court assumes that he did– then argues that even if he did, summary judgment still is appropriate because any reliance by PowerGroup on this representation could not have been reasonable at the time PowerGroup actually signed the License Agreement.  This is because on April 2, 2009, two weeks before the parties executed the License Agreement, Simone emailed Tomberlin his precipitously-reduced sales forecast.  In that email, Simone announced

> FYM has only shipped 50 scooters this week and for the most part
> has not been communicating with us to what is going on.  So with
> that said I have changed the forecast to represent sales of what we
> have in stock and the 50 pieces on the water.  Not to be redundant
> but until we correct the supply issue I can't honestly project sales.

Pacific Cycle argues that, in light of this no-nonsense disclaimer and plain notification of a supply problem, Tomberlin had no reasonable basis to continue to rely on any prior representation that the pre-season orders would "cash flow" the deal.  What's more, Pacific Cycle argues, Tomberlin's subsequent April 9, 2009 email to Pacific Cycle's Dueck–still a week before the license was executed–reflects his understanding that the pre-orders were *not* guaranteed because they might "fade away":

> We have a real sense of urgency to close this out early as possible.
> I am concerned all the pre-orders from your dealers will fade away
> if they believe we cannot supply them with product.

19

PowerGroup does not address either of these emails in its response brief.  In its proposed findings of fact, however, it proposes as a fact that Simone's second April 2, 2009 email "only related to FYM's ability to supply the requested quantity of pre-ordered scooters, and in no way called into question the number of pre-season orders placed by the dealers."  PowerGroup's PPFF, dkt. 27, #49.  Fair enough.  But this raises a critical question that PowerGroup does not answer:  If the sole existing supplier of Schwinn motor scooters could not supply the requested quantity of pre-ordered scooters, then what basis did Tomberlin have for relying on any representation that the pre-orders would cash flow the deal?  Did he believe that he could coax FYM to build and ship 2,297 more scooters (that's 46 shipments of 50 scooters) or find a new supplier in time to satisfy the "banked" pre-orders?[7]  Or did he believe he could demand payment from the dealers who had pre-ordered even though he could not fulfill their orders?  Tomberlin doesn't say.

More damaging still, Tomberlin doesn't explain what he meant when he expressed his concern to Dueck that "all the pre-orders from your dealers will fade away if they believe we cannot supply them with product."  As noted above, Pacific Cycle argues that the only reasonable inference that can be drawn from this statement is that Tomberlin understood that the pre-orders had not been banked and still could be lost.  Indeed, it is difficult to infer what else Tomberlin could have meant, especially because PowerGroup doesn't tell us.  If this was not in fact Tomberlin's understanding at the time he sent his email, then one would have expected

---

[7]  It's not of record whether Tomberlin was more successful than Pacific Cycle at prying more scooters out of FYM.

PowerGroup to have offered clarification from Tomberlin or at least proposed an alternate inference that could be drawn from Tomberlin's April 9 email.  It has done neither.

Pacific Cycle argues that the only reasonable inference that can be drawn from Tomberlin's email is that he understood that the pre-orders were not equivalent to certified checks, bearer bonds, or piles of cash: they *can* "fade away."  In fact, the uncertainty of the pre-orders resulting in actual sales is reflected in the License Agreement itself: the agreement provides that sales of 2009 products "are contingent upon successful transfer of all certificates, assignable dealer agreements, *validity and collection of existing preorders* and the phase in of the 2010 EPA emissions certificates."  (emphasis added).  As with the April 9 email, PowerGroup does not advance any competing inferences that can be drawn from this language.

Of course, credibility determinations, the weighing of the evidence and the drawing of legitimate inferences from the facts are jury functions, not those of the court, *see Stokes v. Board of Educ., of the City of Chicago*, 599 F.3d 617, 619 (7th Cir. 2010), but in the absence of any argument from nonmovant PowerGroup that there is another way to interpret this documentary evidence, then movant Pacific Cycle's proposed inference—which is eminently reasonable— becomes the conclusive inference.  *See, e.g., Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (all that is required to defeat motion for summary judgment "is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve *the parties' differing versions of the truth* at trial")(quoting *First National Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288-89 (1968)); *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005) ("At summary judgment a court may not assess the credibility of witnesses, choose between *competing inferences* or balance the relative weight of conflicting evidence.") (emphasis added); *Bullwinkel*

21

*v. New England Mut. Life Ins. Co.*, 18 F.3d 429, 432 (7th Cir. 1994) (reasonable inference that

plaintiff's breast lump discovered to be cancerous in one month was also cancerous two months

before became "conclusive" where plaintiff failed to present evidence or make any arguments

that record supported competing inference); *Fitzgerald v. Santoro*, 707 F.3d 725, 733 (7th Cir.

2013) ("the inference [plaintiff] asks us to draw in this case . . . strikes us as unreasonable.  At

best, [plaintiff] raises some metaphysical doubt as to a material fact.  That is not enough.");

*Howell v. Motorola*, 633 F.3d 552, 559 (7th Cir. 2011) (nonmovant's suggestion that a jury might

infer from the circumstances that he signed movant's release unknowingly "is just an assumption

. . . it is not evidence.")

Absent competing inferences, there is no work for a jury to do.  Although the question

whether a party's reliance was reasonable is "ordinarily a question of fact,"  *Metavante Corp. v.

Emigrant Sav. Bank*, 619 F.3d 748, 766-67 (7th Cir. 2010) (citing *Sciano v. Hengle*, 1 Wis. 2d 273,

83 N.W. 2d 689, 692 (1957)), where the facts are undisputed, reasonable reliance is a question

of law.  *Ritchie v. Clappier*, 109 Wis.2d 399, 406, 326 N.W.2d 131, 134 (1982).  As the court

explained in *All-Tech Telecom, Inc. v. Amway Corp.*, 174 F.3d 862, 867 (7th Cir. 1999):

> The victim of a misrepresentation about a product who learns the
> truth before he buys, but decides to buy the product anyway,
> cannot complain about the misrepresentation.  *First Credit Corp. v.
> Behrend*, 45 Wis.2d 243, 172 N.W.2d 668, 671-72 (1969); *Foss v.
> Madison Twentieth Century Theaters, Inc.*, 203 Wis.2d 210, 551
> N.W.2d 862, 865-66 (1996).  Whatever he has relied on, it is not
> that.

*See also Ritchie*, 109 Wis.2d at 399, 326 N.W.2d at 134 ("Courts will refuse to act for the relief

of one claiming to have been misled by another's statements who blindly acts in disregard of

knowledge of their falsity or with such opportunity that by the exercise of ordinary observation,

not necessarily by search, he would have known.  He may not close his eyes to what is obviously discoverable to him.") (quoting *Jacobsen v. Whitley*, 138 Wis. 434, 437, 120 N.W. 285, 286 (1909)).  On the evidence actually in the record, the only reasonable inference that can be drawn is that Tomberlin knew before he signed the License Agreement that he could not count on the pre-orders as "bankable" assets that would finance the deal.  Stated another way, no reasonable jury could conclude that it was reasonable for Tomberlin to sign the License Agreement because he was relying on the guaranteed nature of the reported 2,486 pre-orders.  As made clear by the authorities cited above, a representation upon which no reasonable reliance may be placed will not support a misrepresentation action.

### B.  Dealers

PowerGroup contends that Simone represented that Pacific Cycle falsely represented that it had an active dealer network of 471 dealers.  This alleged misrepresentation fails because PowerGroup's evidence is not admissible and in any event, it does not show that Simone's statement was false when made.

To show that Pacific Cycle lied about its dealer network, PowerGroup relies on a spreadsheet, which PowerGroup's attorney asserts is dated July 25, 2008, that appears to contain a list of approximately 380 dealers, and another list of 79 dealers on a worksheet labeled "Kaput Dealers."   However, this spreadsheet is inadmissible because no witness has authenticated it.  "To be admissible, documents must be authenticated by and attached to an affidavit that meets the requirements of Rule 56(e) and the affiant must be a person through

whom the exhibits could be admitted into evidence." *Article II Gun Shop, Inc., v. Gonzales*, 441 F. 3d 492, 496 (7th Cir. 2006).

PowerGroup introduced this document into the record by attaching it to an affidavit from its litigation attorney in this lawsuit, Richard Braun. Attorney Braun does not say where the document came from, who prepared it, he does not explain how he knows the date of the document, and he does not explain (and probably is not qualified to explain) what the document means when it says "Kaput Dealers."[8] Furthermore, the document, which Braun avers is dated July 2008, does not establish that Pacific Cycle did not have 471 dealers five months later, when Simone gave his PowerPoint presentation to Tomberlin. Finally, there is no evidence that Simone was aware of the document or knew (as suggested by PowerGroup) that he was making a false statement when he represented that Pacific Cycle had 471 dealers. Accordingly, even if the document could be authenticated, it does not support a claim of fraudulent inducement because it does not show that Simone's assertion in late 2008 or early 2009 that there were 471 dealers was false or that Simone had reason at that time to know it was false.

### C. "Turn-key" nature of operation

Next, PowerGroup contends that Pacific Cycle falsely characterized its motor scooter division as a "turn-key" operation. As a starting point, how can PowerGroup reconcile its claim that Tomberlin reasonably believed that Pacific Cycle's Motor Sports division was "turn key"

---

[8] That said, the dictionary definition of "kaput" is pretty clear: "(1) utterly finished, defeated or destroyed; (2) unable to function; (3) hopelessly outmoded." *www.merriam-webtser.com/dictionary/kaput*, accessed August 21, 2013. But without input from the document's creator–or some other qualified person from Pacific Cycle, such as a 30(b)(6) witness–we do not know what was meant by the term's use here, or what the shelf-life of the designation was. It smacks of evidentiary bootstrapping for PowerGroup's litigation attorney to attempt to authenticate and interpret his opponent's document on a pivotal fact.

when, before he signed the License Agreement, Simone was warning him that FYM was not shipping scooters and Pacific Cycle's previous sales forecasts were out the window? Tomberlin was well aware that the lack of supply was an urgent problem that needed quick resolution lest the pre-orders fade away; such concerns are not what come to mind when one envisions a "turn key" operation. Tomberlin's subjective belief that he could fix what he thought was broken with Pacific Cycle's supply problems demonstrated the self-confidence of an able handy man eyeing a fixer-upper, not the anxious reliance of a first-time buyer expecting a flawless, trouble-free operation.

In any event, I agree with Pacific Cycle that this statement is merely a vague expression of puffery or opinion on which no reasonable person would rely. *See, e.g., Searls v. Glasser*, 64 F. 3d 1061, 1066 (7th Cir. 1995) (term "recession-resistant" too vague to constitute a material statement of fact and was better deemed "optimistic rhetoric"). PowerGroup does not suggest that the term "turn key" has any particularized meaning in the motor sports industry or otherwise indicates that the term has a well-defined, universally understood meaning. All it relies upon is Tomberlin's own understanding of the term, which is that "all the ingredients to be successful are there. You just have to walk through the door and do the deal." PowerGroup's PPFF, ¶25. Such vague predictions of future success, however, are not actionable; indeed, even "success is itself a subjective term." *Vaughn v. General Foods Corp.*, 797 F.2d 1403 (7th Cir. 1986).

Pacific Cycle's description of its Motor Sports division as a "turn key" operation is akin to statements made by General Foods' regarding the "viability" of its Burger Chef System and the potential of its company in *Vaughn*, 797 F.3d at 1411, or to Snap-On's statements that a

potential Snap-On Tool dealer would make as much money as doctors or lawyers, that the tools would "sell themselves," that a Snap-On dealership is a "no-risk proposition" and that Snap-On territories are all the same in *Loula v. Snap-On Tools Corp.*, 175 Wis. 2d 50, 55-56, 498 N.W. 2d 866 (Wis. Ct. App. 1993). As in both *Vaughn* and *Loula*, the representation that the motor sports division was a "turn-key" operation is merely an expression of opinion designed to encourage investment by new franchisees and not actionable as fraud.

### D.  Dealers "Stuffed" with Inventory

Next, PowerGroup contends that Pacific Cycle failed to disclose that its key dealers were "stuffed" with inventory that exceeded retail demand, which contradicts its assertion that the dealers were "hungry for orders." As proof that the active dealers were "stuffed" with inventory, PowerGroup relies on an inventory report that purportedly shows the scooters remained in dealers' inventory for an average of 205 days, which it argues would be a lower number if the demand was as represented by Pacific Cycle.

Like the "kaput" dealer spreadsheet, the inventory report is inadmissible because it is not authenticated. Again, the report was submitted by litigation counsel, who does not explain where the document came from or what it is. When Tillett was questioned about this report at her deposition, she could not identify it or offer any knowledge to help understand it, and could not say whether the inventory levels disclosed on the report were high or low. To the court's knowledge, PowerGroup did not follow up by requesting an explanation from a 30(b)(6) witness. Absent a witness who can explain the provenance or meaning of the report, PowerGroup has failed to show a genuine dispute of fact on this aspect of its fraudulent inducement claim.

26

Moreover, a party's duty to disclose arises only when the disclosing party knows that the relying party is unaware of the fact. *Kaloti*, 2005 WI 111, at ¶20, 283 Wis. 2d 555, 699, N.W. 2d 205. PowerGroup has no evidence to show that Pacific Cycle knew that PowerGroup did not have a copy of the inventory report. Indeed, given the lack of authentication of the report, the document could have come from PowerGroup's files. Further, Tomberlin testified that he had been provided with all the documentation he needed in order to make the decision whether to enter into the license agreement. There is simply no evidentiary basis to support a claim that Pacific Cycle knowingly failed to disclose the inventory report.

### E. Approach to Termination of Dealers

Because PowerGroup's last contention is not exactly clear, I set it out in full:

> Pacific Cycle sent a press release to each of the active dealerships, and voiced that PowerGroup would receive control over the dealership accounts. However, Pacific Cycle continued to maintain control over the dealerships, thus preventing PowerGroup from effectively utilizing them and/or terminating dealerships that were no longer active to develop its own dealer channel. . . . They also knew that PowerGroup would have to develop its own dealer network to sell motor scooters, but would have difficulty doing so under state regulations unless Pacific Cycle terminated inactive dealerships.

Br. in Opp., dkt. 26 at 22. PowerGroup contends that "[t]hese are facts of which George Simone and Pacific Cycle had exclusive knowledge, and which under the circumstances PowerGroup would reasonably expect truthful disclosure."

Like so many of PowerGroup's other contentions, this one fails on multiple levels, not least of which is a lack of evidence. PowerGroup fails to present admissible evidence regarding the "state regulations" to which it refers (the cited portion of Tillett's deposition does not

27

support the proposed fact), any evidence to support its contention that PowerGroup "had to develop its own dealer network" in order to sell scooters, any specific evidence supporting its claim that Pacific Cycle's refusal to terminate non-active dealers impeded PowerGroup from approaching other dealers, or any evidence that anyone at Pacific Cycle "knew" any of these alleged facts at the time of license negotiations.  It also fails to offer any evidence to show that it reasonably relied on statements made by Pacific Cycle in its press releases to dealers, or that Pacific Cycle knew or should have known that PowerGroup would rely on these statements. *See Rendler v. Markos*, 154 Wis. 2d 420, 429, 453 N.W. 2d 202, 205 (Ct. App. 1990) ("A complaint pleading negligent or intentional misrepresentation must allege that the defendant misrepresented a fact to the plaintiff or to a third person with intent that it would be communicated to or influence the plaintiff.").

Furthermore, as Pacific Cycle points out, information regarding how Pacific Cycle later would treat dealers who were not actively selling Schwinn motor scooters does not relate to a present fact in existence at the time of the negotiation of the license agreement, but concerns a future event.  To constitute an actionable misrepresentation (or material omission), the fact misrepresented or omitted must "relate to present or pre-existing events or facts and may not be merely a prediction of future events or an unfilled promise." *Fed. Deposit Ins. Corp. v. Lauterbach,* 626 F.2d 1327, 1334 (7th Cir. 1980).  PowerGroup does not present any evidence of any discussions during negotiation of the license agreement concerning how Pacific Cycle would handle a dealer who was not selling Schwinn motor scooters or who had not honored its pre-season orders; that issue did not arise until Tomberlin emailed Dueck in September 2010 to ask about terminating dealers "that are not ordering but still tying up a market."  Pacific

28

Cycle's decision *17 months after the agreement was executed* that it would not terminate dealers who were not ordering product did not relate to facts existing at the time the agreement was executed.

In sum, PowerGroup has failed to present admissible evidence from which a reasonable juror could find that Pacific Cycle fraudulently induced it into entering the license agreement. Accordingly, its fraudulent inducement defense to the breach of contract claim, as well as its tort claim for misrepresentation, both fail.

### III. Breach of Contract

PowerGroup alternatively argues, as both a counterclaim and a defense to Pacific Cycle's breach of contract claim, that it was relieved of its obligations under the License Agreement because Pacific Cycle was the first to materially breach the contract. *See Mgmt. Computer Servs., Inc. v. Hawkins, Ash, Baptie & Co.*, 206 Wis. 2d 158, 183, 557 N.W. 2d 67, 77 (1996) ("It is well established that a material breach by one party may excuse subsequent performance by the other."). "A breach is material if it destroys the essential object of the agreement or deprives the non-breaching party of a benefit that the party reasonably expected." *Int'l Prod. Specialists, Inc. v. Schwing Am., Inc.*, 580 F.3d 587, 595 (7th Cir. 2009). If the breach is relatively minor, the non-breaching party will not be excused from its contractual performance. *Cabinet Ingenuity & Design, LLC v. Vill. Park Dev., LLC*, 2011 WI App 136, ¶16, 337 Wis. 2d 426, 805 N.W. 2d 734 (unpublished), *rev. denied*, 2012 WI 2, 338 Wis. 2d 322, 808 N.W. 2d 714.

PowerGroup contends that Pacific Cycle breached the term of the License Agreement that required it to provide PowerGroup with "copies of all dealer agreements, files, warranty history, proof of insurance, product programs, EPA certificates, pre-season orders, state license and all

other documentation necessary to transition the business."   According to Tomberlin, PowerGroup never received any of the pre-season order forms or dealer agreements.

Even assuming this is a technical breach of the disclosure provision, PowerGroup has failed to present evidence that the breach caused any injury or otherwise destroyed the essential object of the agreement.   As Pacific Cycle points out, the spreadsheet that Simone sent to Tomberlin in early April 2009 included full information about each pre-order, including the dealer who placed the order, the order number and the models and quantities ordered.   Although PowerGroup asserts that without the dealer agreements and pre-season orders, it was "powerless" to enforce its rights, it fails to explain how or why this is so.   Furthermore, PowerGroup's assertion erroneously assumes that it had "rights" to enforce with respect to the pre-season orders; the undisputed facts adduced in this proceeding, however, show that the dealers were under no contractual obligation to fulfill their pre-season orders.   Finally, Tomberlin's conclusory assertion that the documents were "necessary" to run the Motor Sports division successfully is insufficient to refute Simone's testimony that he had all the documentation regarding pre-season orders and the dealer network that he needed.   It is undisputed that Simone, not Tomberlin, was in charge of executing PowerGroup's business plan for Schwinn motor scooters.   All told, PowerGroup has failed to present evidence from which a jury could find that Pacific Cycle materially breached the License Agreement.

## IV.  Breach of Contract Damages

Having established as a matter of law that PowerGroup has no viable defense to its breach of contract claim, Pacific Cycle asks this court to enter judgment in its favor in the

amount of $1.56 million, which represents the sum of the minimum royalties owed by PowerGroup under the terms of the License Agreement, plus interest at a rate of 12% per annum and attorneys' fees.  PowerGroup  has not disputed that the minimum royalties in the license agreement are reasonable stipulated damages.  Instead, it argues vaguely that there are disputes of fact as to whether the parties were operating under the reduced royalty terms in the August 2010 proposal by Pacific Cycle and whether PowerGroup is entitled to any offsets, "including warranty claims, returned inventory and investment necessary to rebuild the 'turn key' Motor Sports Division."

PowerGroup's first argument is a dead letter:  I already have found it to be undisputed that PowerGroup never accepted Pacific Cycle's August 2010 proposal; therefore, the original terms of the license agreement remain in effect.

Its second argument also fails for lack of proof.  Although Tomberlin avers that PowerGroup incurred "significant cost and expense" covering Pacific Cycle's warranty obligations under state and federal law, it offers no particularized evidence showing the amount of these costs.  Likewise, it fails to present any itemization of any other costs or expenses it incurred that might operate to offset the amount of royalties due or otherwise reduce the amount of liquidated damages owed under the Agreement.  When, as here, the moving party discharges its burden of showing it is entitled to judgment as a matter of law, the non-movant is obligated to respond by pointing to *specific* evidence in the record showing that a material dispute of fact exists.  "[S]aying so doesn't make it so; summary judgment may only be defeated by pointing to admissible evidence in the summary judgment record that creates a genuine issue of material fact." *U.S. v. 5443 Suffield Terrace, Skokie, Ill.*, 607 F.3d 504, 510 (7th Cir. 2010).  At this "put up or shut

31

up" juncture in the lawsuit, it is not enough for PowerGroup to state generally that it incurred "significant" costs that give rise to a dispute about damages; it was required to propose specific facts showing those expenses and establishing a legal entitlement to a reduction in the liquidated damages called for by the parties' agreement.  Having done neither, PowerGroup has not shown a material dispute of fact concerning damages.

## ORDER

It is ORDERED that:

(1)  Plaintiff Pacific Cycle's motion for summary judgment on its breach of contract claim against PowerGroup and on PowerGroup's counterclaims is GRANTED.

(2)  PowerGroup's counterclaims are DISMISSED WITH PREJUDICE.

Entered this 30th day of August, 2013.

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge