IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

PACIFIC CYCLE, INC.,

                Plaintiff,                OPINION & ORDER

   v.

                                           12-cv-529-wmc

POWERGROUP INTERNATIONAL, LLC,
(a/k/a POWERGROUP INTERNATIONAL, INC.),
TOMBERLING AUTOMATIVE GROUP, INC.
and MICHAEL TOMBERLIN,

                Defendants.

---

On October 28, 2013, a trial was held to address a remaining issue still before this court: whether, under the equitable doctrine of alter ego, defendant Michael Tomberlin should be held jointly and severally liable for contractual damages arising from defendant PowerGroup International, LLC's breach of its licensing agreement with plaintiff Pacific Cycle, Inc.[1] Tomberlin and Pacific Cycle both appeared by counsel. After hearing opening statements and Pacific Cycle's case-in-chief, including its adverse examination of Mr. Tomberlin, the court granted Tomberlin's motion for a directed verdict. As contemplated at the time, this opinion and order memorializes and supplements the findings and reasons for the court's ruling previously stated on the record.

---

[1] One more claim in plaintiff's complaint remains unaddressed: whether, under the same and related equitable doctrines, co-defendant Tomberlin Automotive Group, Inc. ("TAG") should be held jointly and severally liable for PowerGroup's breach. Proceedings on that claim have been stayed as a result of TAG's recent bankruptcy filing.

# FINDINGS OF FACT

A. The Parties and Related Entities

1. Plaintiff Pacific Cycle, Inc. is a Delaware corporation with its principal place of business in Madison, Wisconsin.

2. Between 2005 and 2009, Pacific Cycle operated a Schwinn Motor Sports Division to sell Schwinn-brand motor scooters.

3. Defendant PowerGroup International, LLC is a Georgia limited liability company formed in May 2002. Its business was manufacturing and selling gas-powered ATVs and scooters through a dealer direct network.

4. Ameritech Industries, LLC, is a Georgia limited liability company that is the sole member and owner of PowerGroup.

5. Defendant Michael Tomberlin is an adult citizen and resident of the State of Georgia. He is the president and CEO of PowerGroup and the sole member and owner of Ameritech Industries, LLC.

6. Defendant Tomberlin Automotive Group, Inc. ("TAG") is a corporation that was organized in Georgia in 2006. Its primary business is to manufacture and sell through a dealer network specialty off-road vehicles that run on electricity. Michael Tomberlin is the majority owner of TAG, holding approximately 80% of the interest, and is its chief executive officer. Two independent individuals apparently own and control the other 20%.

7. Asian Ventures, LLC was a Georgia limited liability company of which Michael Tomberlin was the sole member.

8. Unless formally merged, Michael Tomberlin and his companies generally maintained the technical, legal and accounting formalities one would expect for distinct legal entities.

9. Pursuant to 28 U.S.C. § 1332, this court has diversity jurisdiction over this matter based on complete diversity between the plaintiff and defendants, as well as an amount in controversy exceeding $1.5 million.

**B.  The License Agreement**

10. In late April 2009, Pacific Cycle entered into a License Agreement with defendant PowerGroup.  The agreement incorrectly identified the licensee, PowerGroup, as an incorporated entity rather than as a limited liability company.  The correct designation of the licensee is PowerGroup International, LLC.  PowerGroup International, Inc., did not and does not exist, but this was by mutual mistake and is ultimately immaterial to the issues in controversy.

11. In Exhibit G to the License Agreement, Michael Tomberlin also indicated that he was the 100% owner of the licensee.  Technically, this, too, was incorrect: Ameritech Industries is the 100% owner of PowerGroup.  Because Tomberlin was and is the 100% owner of Ameritech Industries, he was for all practical purposes also the 100% owner of PowerGroup.

12. The License Agreement granted PowerGroup the right to sell Schwinn-branded motorized scooters in exchange for a 10% royalty, certain minimum payments, and undertaking continuous manufacturing sourcing, marketing, distribution and warranty service.

13. While there were no minimum sales or royalty obligations for 2009 or 2010, PowerGroup had minimum sales requirements and owed a minimum royalty of $300,000 beginning in 2011 (Contract Year 3). These minimums were established based on expected sales performance by PowerGroup, projected sales and robust assumptions about the quality of both parties' distribution networks, all of which proved unrealistic in light of a drastic collapse of the market for Schwinn (and indeed all) motorized scooters, as well as the growth in warranty service obligations undertaken by PowerGroup and its dealers on Schwinn scooters already in circulation. Under the Agreement, these minimums were to increase modestly each year of the license through its initial term, which ended in 2014.

14. The License Agreement also provided that PowerGroup would provide warranty service to the Schwinn scooters that Pacific Cycle had sold prior to the agreement, for which PowerGroup would be reimbursed by Pacific Cycle.

15. In entering into the License Agreement with PowerGroup, Pacific Cycle relied almost exclusively on the fact that Tomberlin and TAG had expertise and success in the manufacturing, marketing and sales of motorized ATV and scooter markets. As a result, Pacific Cycle made no effort to determine whether PowerGroup was adequately capitalized, sufficiently staffed or otherwise capable of performing under the License Agreement.

16. Similarly, Pacific Cycle neither sought nor obtained a personal guarantee from Michael Tomberlin for any unfulfilled obligations undertaken by PowerGroup in the License Agreement.

17. Pacific Cycle also declined to perform even basic credit checks or seek credit information from PowerGroup, TAG or Michael Tomberlin before executing the Agreement.

18. Although Section 8.2 of the License Agreement gave Pacific Cycle the unlimited right, on 10 days' notice, to inspect PowerGroup's books and records, it also did not avail itself of this right at any time.

19. The License Agreement contains a broad non-assignment clause that prevents PowerGroup from assigning or delegating any of its rights or responsibilities under the agreement. Paragraph 9.1(a) provides:

> LICENSEE acknowledges that this agreement and the rights granted herein are personal to the LICENSEE and, without the prior written consent of LICENSOR, may not be assigned, sublicensed, pledged, encumbered or otherwise affected, nor may any of LICENSEE's duties be delegated. Any attempted assignment, sublicense, transfer or encumbrance shall be void and shall constitute an incurable breach of this Agreement, entitling, but not obligating LICENSOR to terminate this Agreement in accordance with the provisions of Paragraph 10.2.

C. **PowerGroup's Difficulties In Performing Under the Agreement**

20. Given the massive, global economic downturn in 2009 and 2010, the sales that Pacific Cycle, Michael Tomberlin and PowerGroup had projected would cover

5

PowerGroup's payment obligations under the License Agreement never materialized. The lack of revenue from sales caused PowerGroup to suffer substantial financial losses.

21. Between February and July of 2010, Tomberlin repeatedly raised concerns to Pacific Cycle that, despite claiming to have invested approximately $1 million in the venture, he no longer expected to be able to meet the annual, mandatory minimum payments coming due beginning in 2011 under the License Agreement.

22. On March 22, 2010, Tomberlin advised Pacific Cycle's president, Alice Tillett, by e-mail that "we will pay the [10%] royalties [due on actual sales] but not the minimums under our agreement." Pacific Cycle agreed to consider a modification of the minimum royalty, but refused to eliminate the guaranteed minimum royalty requirement altogether for fear of eliminating any incentive for PowerGroup to continue efforts to sell Schwinn-branded scooters over which it still enjoyed an exclusive license.

23. On August 11, 2010, Tillett sent Tomberlin a formal memorandum offering to amend the Agreement to reduce PowerGroup's annual guaranteed minimum royalties drastically (essentially seeking only a guarantee of the 10% royalty due under the License Agreement), based on a roughly 90% reduction in the originally-projected sales for each remaining year as the bench mark.

24. Although Pacific Cycle never withdrew this offer for the remainder of 2010 or at any time during the year 2011, neither did PowerGroup ever accept or otherwise respond to the proposal. This was because Tomberlin wanted PowerGroup to be freed from *any* minimum payment obligation given the severity of the market

6

downturn and PowerGroup's growing warranty obligations. Thus, the License Agreement was never formally amended to reflect any reduced minimums.

25. During 2009 and 2010, Asian Ventures, Inc. had an agreement to provide PowerGroup, TAG and Tomberlin's corporate entities with management, legal, accounting and other services for an established fee for shared services.

### D. Merger and Management Agreement

26. On January 1, 2011, Asian Ventures merged with PowerGroup, LLC, with PowerGroup becoming the surviving entity. This formal merger was accomplished with the assistance of outside legal counsel, but without notice to Pacific Cycle.

27. The next day, on January 2, 2011, Michael Tomberlin personally prepared a Management Agreement, pursuant to which TAG would take over PowerGroup's day-to-day operations, including the sale and distribution of Schwinn motor scooters. This Agreement was neither reviewed by counsel nor disclosed to Pacific Cycle.

28. Michael Tomberlin executed the Management Agreement on behalf of both PowerGroup and TAG.

29. As part of the Management Agreement, all of PowerGroup's assets and most of its liabilities were also transferred to TAG. (Plaintiff's Ex. 57) All that remained in PowerGroup was an inter-company debt to TAG in the amount of approximately $1.3 million and, of course, its obligations to Pacific Cycle under the License Agreement, which TAG had now agreed to fulfill.

30. At the time of transfer, PowerGroup was more than a million dollars in debt and facing hemorrhagic losses. Plus, virtually all of the tangible assets of PowerGroup secured debt to its primary lender, including its cash and cash equivalents and accounts receivable.

31. Like the merger of Asian Ventures with PowerGroup and the Management Agreement between PowerGroup and TAG, the transfer of assets and liabilities from PowerGroup to TAG were not disclosed to Pacific Cycle.

32. Under the Management Agreement, TAG also agreed to pay PowerGroup "a royalty/fee of 7% for all dealer parts and Schwinn scooter sales," with such payments to be "paid monthly or quarterly at the discretion of TAG for the prior month or quarter sales."

33. Although there was a dispute as to whether TAG's payment of 7% of the sale price of product due to PowerGroup under the Management Agreement would cover PowerGroup's obligation to pay 10% of the wholesale cost of the same product to Pacific Cycle due under the License Agreement, it appears from general testimony at trial regarding dealer markups that this was likely the case (or at least that plaintiff had no proof to the contrary). At the same time, TAG's obligation to pay extended only to its *actual* sales and in no way obligated TAG to cover any minimum payment obligation PowerGroup had to Pacific Cycle.

34. The Asian Ventures merger and the Management Agreement constituted "incurable breaches" of the non-assignment provision in paragraph 9.1(b) of the License Agreement between Pacific Cycle and PowerGroup.

35. After Tomberlin's execution of the Management Agreement, PowerGroup's business was operated entirely out of TAG. Schwinn motor scooters were sold by TAG and appeared on TAG's books.

36. Pacific Cycle was unaware of the merger, Management Agreement and the transfer of assets until they were discovered in the course of this litigation.

### E. Termination of License Agreement

37. TAG sold approximately $720,000 in Schwinn scooters in 2011.

38. TAG's financial records reflect royalty payments to PowerGroup only in January, February and March of 2011, totaling $34,658.

39. Between April and December of 2011, TAG sold more than $380,000 in Schwinn motor scooters. TAG paid no royalty to PowerGroup for these sales.

40. In late 2011 and early 2012, Pacific Cycle's licensing manager, Danna Dueck, began to press PowerGroup for overdue payments and royalty reports.

41. On January 24, 2012, Tomberlin sent an email to Dueck, stating that he regarded PowerGroup's "Schwinn decision" to be an "error" and asked her to "suggest the best path to execute this separation."

42. On February 1, 2012, Pacific Cycle sent PowerGroup a "Notice of Breach"; on April 9, 2012, counsel for Pacific Cycle sent PowerGroup a "Notice of Termination" of the License Agreement. Pacific Cycle received no response to either notice.

43. On December 20, 2012, Michael Tomberlin, again signing for both companies, entered into a one-page document titled "Settlement of Tomberlin Automotive

Group, Inc. vs. PowerGroup International LLC," which purported "to exercise their right to immediately terminate their Management Agreement without recourse" by either party for damages.

44. PowerGroup breached the license agreement by: failing to submit royalty reports for the third or fourth quarters of 2011; failing to pay any earned royalty for that time period; and failing to pay the mandatory minimum royalty for 2011.

45. PowerGroup is now liable to Pacific Cycle for $1.56 million, which is the sum of the minimum royalties owed by PowerGroup under the terms of the License Agreement, plus interest at a rate of 12 percent per annum, and Pacific Cycle's attorneys' fees.

46. Ultimately, Michael Tomberlin received no tangible financial benefit from PowerGroup's entering into or his efforts to operate PowerGroup and later TAG under the License or Management Agreements. Moreover, whatever indirect benefit Tomberlin might have had in owning assets that once existed in PowerGroup, Asian Ventures or TAG, as well as from consolidating his holdings in all three in 2011 remain in TAG, which is now in bankruptcy in Georgia.

OPINION

Whether under Wisconsin or Georgia law, the parties agree that plaintiff Pacific Cycle must prove three elements to prevail on an alter-ego claim against defendant Michael Tomberlin. First, there must be "[c]ontrol, not mere majority or complete stock control, but complete domination, not only of finances but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own." *Consumer's Co-op. of Walworth Cnty. v. Olsen*,

142 Wis. 2d 465, 484, 419 N.W.2d 211 (1988). Second, "[s]uch control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or dishonest and unjust act in contravention of plaintiff's legal rights." *Id.* Third, "[t]he aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of." *Id.* Ultimately, "the fiction of corporate entity is not to be lightly regarded" under Wisconsin law, *id.* at 475 (quoting *Milwaukee Toy Co. v. Indus. Comm'n of Wis.*, 203 Wis. 493, 496, 234 N.W. 748 (1931)), and "the absence of any one of [the three] elements prevents 'piercing the corporate veil.'" *Id.* at 485 (citation omitted). While plaintiff has met its burden as to the first of these elements, the court finds it has not as to the other two.

### I. Complete Control and Lack of Separate Corporate Personality

There is no dispute that Tomberlin had complete control of PowerGroup through his 100% ownership of Ameritech LLC, which in turn owns 100% of PowerGroup, both before and after its merger with Asian Ventures. Even so, simple ownership is not enough to justify piercing the corporate veil; plaintiffs must show "domination," not just of finances but also of policy and business practice, to the point that PowerGroup lacked a separate personality and existence.

Given Tomberlin's apparent formal observance of these distinct entities both legally and financially up to and including the formal merger of Asian Ventures with PowerGroup, plaintiff fails to establish this kind of dominance until Tomberlin effectively dissolved PowerGroup into TAG through the so-called "Management Agreement," which Tomberlin unilaterally executed without the benefit of counsel on behalf of both PowerGroup and

11

TAG on January 2, 2011.  The court finds that with respect to that transaction, Tomberlin blatantly disregarded PowerGroup's corporate form and exercised complete domination over it, such that PowerGroup became a mere shell corporation without a separate financial or business existence and an instrumentality for TAG's and Tomberlin's own ends.  Indeed, through the Management Agreement, Tomberlin effectively stripped PowerGroup of its assets and separate personality alike, while maintaining a separate corporate identity in name only.  Tomberlin's control also reached the level required for a finding of alter ego: he entirely dominated not only PowerGroup's finances in shifting all of its assets and virtually all liabilities, but also its business practices and policies by signing over PowerGroup's responsibilities, obligations and operations to TAG, and ultimately even purporting to sign away any claim PowerGroup may have against TAG.  The court accordingly finds that plaintiff successfully established the first requirement for demonstrating alter ego liability.

**II. Use of Control to Commit Fraud, Wrongdoing or Injustice**

Having met their burden of proof as to the first element of alter ego, plaintiff's proof nevertheless falls short with regard to Tomberlin using his dominance over PowerGroup to commit some fraud, wrongdoing or injustice.  *Consumer's Co-op*, 142 Wis. 2d at 484-85 ("[C]ontrol, absent a showing of injustice, would not justify exception to the general rule of corporate nonliability.").  While the execution of the Management Agreement on January 2, 2011, constituted a breach of the terms of the License Agreement between PowerGroup and Pacific Cycle, as did the formal merger of PowerGroup and Asian Ventures the day before, this breach does not rise to the level of fraud or injustice.  Indeed, it is unclear that

12

Tomberlin had a duty to disclose the breach to Pacific Cycle at all, much less that his failure to do so rises to the level of fraud, inequitable conduct or some other injustice.

During argument on the motion for a directed verdict, counsel for Pacific Cycle indicated that such a duty to disclose was recognized by the Wisconsin Supreme Court in *Kaloti Enterprises, Inc. v. Kellogg Sales Co.*, 2005 WI 111, 283 Wis. 2d 555, 699 N.W.2d 205. There are a number of problems with this argument, even beyond the fact that the circumstances in *Kaloti* were exceptionally egregious. First, *Kaloti* concerned a claim of intentional misrepresentation to induce entry into a contract, requiring an act or omission intended to induce another to act upon it. There is no such claim here. Not only did *Kaloti* involve solicitation of a new deal, the court found the fraud claim was not barred by the economic loss doctrine because it was "extraneous to, rather than interwoven with, the contract." *Id*. at ¶¶ 42-51. Here, any arguable duty to disclose arose not only out of an *ongoing contractual relationship,* but specifically out of an argued failure to disclose a breach of the contract's specific terms, meaning any breach sounds in contract, not tort, much less in intentional fraud. Second, there was in fact no contractual relationship between Tomberlin himself and Pacific Cycle at all, meaning Tomberlin lacked even an arguable duty to disclose, even if the court were to presume that PowerGroup had such a duty.[2] Third, though Pacific Cycle's counsel argued to the contrary, it is not clear, for the reasons explained in the next section of this opinion, that Tomberlin's corporate machinations attempting to revitalize the Schwinn scooter business by consolidating it in TAG, while a

---

[2] To find that Tomberlin had such a duty because he was in effect a party to the contract due to his claimed alter ego status would be an impossibly circular argument, since it would depend on the court finding his breach of that duty was what made him liable as an alter ego.

13

technical breach, were ultimately "material" to the business's failure, or would, at the time, have been material to Pacific Cycle's decision to continue the business relationship given its lack of any good alternative. Finally, *Kaloti* explains that one factor required to find a duty to disclose a fact is that the fact is "peculiarly and exclusively within the knowledge of one party, and the mistaken party could not reasonably be expected to discover it." *Id.* at ¶ 20. Here, Pacific Cycle had the unlimited right to examine PowerGroup's books and records, which disclosed exactly what had taken place between PowerGroup and TAG.

Moreover, on the evidence presented at trial, it is no more likely that Tomberlin was attempting to conceal his shifting of assets from Pacific Cycle, as plaintiff contends, than engaging in an ultimately unsuccessful attempt to keep his sundry business ventures afloat, including his doomed License Agreement with Pacific Cycle, in response to pressure from his companies' secured lenders. *Compare Consumer's Co-op*, 142 Wis. 2d at 486-89 (declining to pierce the corporate veil where transactions were undertaken "for the purpose of infusing, rather than withdrawing, capital"), *with CNC Serv. Ctr., Inc. v. CNC Serv. Ctr. Inc.*, 753 F. Supp. 1427, 1449 (N.D. Ill. 1991) (applying Wisconsin law and piercing the corporate veil where "the shareholders had continued to enrich themselves even while the corporate capital was being eroded and while payment to the corporate creditors … was being evaded by fancy footwork on the part of the shareholders"); *see also Taurus IP, LLC v. Ford Motor Co.,* 539 F. Supp. 2d 1122, 1126 (W.D. Wis. 2008) (no alter ego liability where all plaintiff established was that individual "was a sole managing member of both [corporate entities] and was involved in the transfer of the patent from one entity to another in a suspicious time period," which the court deemed a "far cry" from establishing that entity had no will of its own and was used to commit fraud). Thus, the court finds it no more likely than not

that Tomberlin intended to commit any fraud or injustice on Pacific Cycle, meaning that plaintiff has not met its burden to demonstrate the second element required to find alter ego liability.

If anything, the evidence tips against plaintiff given the deposition testimony of Earl Hensley, Jr., PowerGroup's former controller and the one most familiar with the business's finances, which plaintiff proffered in its case-in-chief. Hensley adamantly testified that the Management Agreement was executed for "one reason and one only": to take advantage of the Net Suite systems TAG had in place, thereby increasing the ease of oversight and administration while simultaneously decreasing costs. (Hensley Dep. (dkt. #123-1) 192:1-19.) While certainly not conclusive, Hensley's testimony not only failed to bolster plaintiff's proof of the "fraud or wrongdoing" in the transactions that Tomberlin orchestrated between PowerGroup and TAG, it actually confirmed the disastrous financial straits PowerGroup was confronting, necessitating its being folded into TAG as a business matter and to appease creditors.

## III. Proximate Cause

Hensley's testimony is even more devastating to plaintiff's attempt to prove the third element of its alter ego claim -- that Tomberlin's control over PowerGroup proximately caused the injuries for which it now seeks relief. *Consumer's Co-op.*, 142 Wis. 2d at 484. As articulated at trial, plaintiff claims that Tomberlin's failure to disclose the execution of the Management Agreement, and thereby his breach of the License Agreement, was not only fraudulent or inequitable conduct, but also frustrated Pacific Cycle's ability to declare a

breach and swoop in to recover its losses. The evidence at trial was very much to the contrary.

Even if the court were to take as true plaintiff's theory of the case and presume that Tomberlin was engaging in a "shell game" with his companies in order to defraud Pacific Cycle of assets, the causal link between that "shell game" and any injury to Pacific Cycle is insufficient, because plaintiff failed to demonstrate that Pacific Cycle was actually injured by the Management Agreement. If anything, the Management Agreement allowed Tomberlin and TAG to limp along a little further trying to revive sales of Schwinn-branded scooters and the moribund dealer network. Moreover, as Hensley testified, by the time Tomberlin executed the Management Agreement, PowerGroup's liabilities exceeded its assets -- that is, the company was already underwater. (Hensley Dep. (dkt. #123-1) 188:21-189:3.) Even more devastating, those assets PowerGroup still had -- comprised almost exclusively of its accounts receivable, certificates of deposit and bank accounts -- were collateralizing its bank loans, strongly suggesting that those, too, would have been unavailable to satisfy Pacific Cycle's unsecured claims in any event. (*Id.* at 163:5-14; 167:13-168:3.)

Finally, even if Pacific Cycle had been able to wrench back its right to market Schwinn-branded scooters sooner, there is no evidence it would have done any better than Tomberlin. Indeed, the business appears to have been in a death spiral as soon as the market turned. The best evidence of that is Pacific Cycle's refusal to take Tomberlin up on his offers to sell back the business or to come forward with another suitor interested in taking on the line.

**IV. Equities**

Finally, the court would be remiss in failing to address the equities here, since alter ego liability is ultimately an equitable remedy. Pacific Cycle wholly failed to demonstrate that imposing liability on Tomberlin personally would be equitable. If anything, it strikes this court that very much the opposite is true. From the outset, Pacific Cycle placed no reliance on PowerGroup's financial wherewithal to undertake the varied tasks of supervising production, sale, distribution and aftermarket service obligations of the Schwinn-branded scooter product line as contemplated in the License Agreement, much less to honor its minimum payment obligations in the event of a market downturn.

Instead, Pacific Cycle's new president had determined the entire scooter business fell outside its core competence and was either going to discontinue the line altogether or offload it on another company. The latter was preferable, since market abandonment might have damaged Pacific Cycle's greatest asset (the Schwinn brand) by engendering ill-will among its dealers and retail customers, as well as left Pacific Cycle with tail liability from corporate structure, holdings, and warranty obligations on past sales. Hensley's testimony underscored this latter concern.[3] These concerns are no doubt why Pacific Cycle was satisfied with Tomberlin's and TAG's reputation and apparent expertise in the ATV and motorized scooter market, rather than inquiring into PowerGroup's balance sheet. In fact, Pacific Cycle demonstrated *no* interest in the finances or viability of PowerGroup, TAG or Tomberlin's other entities, much less Tomberlin himself, despite having every opportunity to investigate both before *and* after it contracted to do business with PowerGroup. *Cf.*

---

[3] Accordingly to Hensley at least, Schwinn's scooter product line was in trouble and (unbeknownst to Tomberlin) Pacific Cycle was looking at an enormous number of outstanding warranty issues on the horizon. (Hensley Dep. (dkt. #123-1) 151:7-12.)

*Consumer's Co-op.*, 142 Wis. 2d at 481-82 ("[W]hether a contractual relationship is truly one in which a creditor had the opportunity to investigate the capital structure of a debtor and knowingly failed to exercise the right to investigate before extending credit, such that the creditor should be precluded from piercing the corporate veil, should be decided with respect to the particular facts of each case.").

Pacific Cycle also presented no evidence demonstrating that PowerGroup, TAG or Tomberlin lacked the intent to make a good faith effort to turn the Licensing Arrangement into a profitable business venture for all, and the evidence presented at trial suggested that they *did* make such an effort.[4] And when the market crashed, Pacific Cycle seemed more than happy to renegotiate the minimum payment requirement to a fraction of the payment originally due under the Agreement, which Pacific Cycle knew full well had been established under its own, far rosier market scenario. While these facts are not dispositive, they certainly have some bearing on the equities here and, in particular, on the overarching unfairness of holding Tomberlin personally liable for more than $1.5 million in minimum payments under the License Agreement.

Pacific Cycle may have had a stronger argument were TAG before this court. Indeed, this would have been an entirely different claim if brought against TAG, since PowerGroup's assets and liabilities (whatever they amounted to) unquestionably ended up in TAG. As it stands, however, this court may consider only the potential for alter ego liability against Tomberlin himself, and Pacific Cycle has produced *no* evidence that

---

[4] Pacific Cycle's own conduct during the tenure of the licensing arrangement also tends to support this conclusion. Its willingness to reduce the amount of the mandatory minimums from $300,000 to $23,000 suggests that it viewed the poor sales as understandable, given the realities of the market, and not that it viewed PowerGroup's failure to pay to be part of a fraudulent or ill-motivated scheme meant to work an injustice.

Tomberlin personally ended up with any of PowerGroup's assets, nor that he otherwise benefitted personally from the execution of the Management Agreement or subsequent events.

To the extent that PowerGroup's assets remain with TAG, Pacific Cycle may pursue them in bankruptcy, but there is no proof that PowerGroup's assets ended up in *Tomberlin's* hands. Additionally, and more importantly, Pacific Cycle was able to offer no proof that it would have been any better off in the end had Tomberlin simply left PowerGroup as it was. While Pacific Cycle *speculates* that it may have been able to pursue PowerGroup directly and recover some assets were it not for the Management Agreement, the evidence at trial was to the contrary. Given the high burden of demonstrating alter ego liability and the requirement that plaintiff prove a causal link between the alleged inequitable conduct and the damages claimed, the court finds that Pacific Cycle has fallen well short of demonstrating that Tomberlin himself can, much less should, be held liable as the alter ego of PowerGroup.

ORDER

IT IS ORDERED that plaintiff Pacific Cycle, Inc.'s claim of alter ego liability against Michael Tomberlin is DISMISSED with prejudice, judgment be entered in his favor, and that this case be closed pending further action of the Georgia bankruptcy court.

Entered this 6th day of November, 2013.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge